# CASES

IN THE

# SUPREME COURT OF ALABAMA.

DECEMBER TERM, 1884.

## Martin *v.* The State.

*Indictment for Murder.*

1. *Organization of grand jury; recitals construed as to number of jurors appearing and serving.*—Where the record, in its caption, contains these recitals: "The sheriff returned into court the *venire facias* commanding him to summon the following named persons to serve as grand jurors, to-wit," setting out the names of eighteen persons, and among them C. H. Spencer, T. R. Sylvester, Hugh McLean, and D. McDonald; "of whom fifteen appeared to serve, and C. H. Spencer was appointed foreman, who, with the other qualified citizens (except T. R. Sylvester, Hugh McLean, and D. McDonald, who was excused by the court), competent as grand jurors, were duly sworn," &c.; these recitals show, with sufficient certainty, that the three jurors named were excused from service, and that the remaining fifteen were sworn and organized into a grand jury.

2. *Special and adjourned terms; order setting day for trial.*—Where the record shows that the trial was had at an extra term of the court, which was called and held in strict conformity with the statutory provisions regulating both special and adjourned terms (Code, §§ 652, 654; Sess. Acts 1874–5, p. 201; *Ib.* 1875–76, p. 210), and on the day specified in the orders calling said extra term; it is no objection to the regularity of the proceedings, that the order fixing the day for the trial was made on the day before the final adjournment of the regular term, while the order for the adjourned term was not made until the next day, and just before the adjournment; nor is it necessary that an order should be made at said extra term, setting a day for the trial.

3. *Special venire in capital case, at special or adjourned term.*—When the order setting the day for the trial at the special or adjourned term directs "that the names of fifty competent persons be drawn and summoned for the trial of this case," and the order for the adjourned term also directs that the same number be drawn "to serve as petit jurors at said adjourned term"; and the jury is organized, without objection, from the *venire* thus drawn and summoned (Code, §§ 4739, 4874), there is no irregularity which is available on error. (STONE, C. J., "inclining to the opinion, that section 4739 should be held to apply to all extra terms, whether special or adjourned.")

1

4. *Proof of former difficulty ; admissibility of entire conversation, when part has been received.*—Proof of a previous altercation or difficulty between the defendant and the deceased, a few days before the killing, is admissible evidence against the defendant, though the particulars or merits of that difficulty cannot be inquired into; yet, when the prosecution has proved the defendant's subsequent declarations relative to that difficulty, in the nature of threats, and the defendant has proved other parts of his declarations in the same conversation, the prosecution may call for all that was said at the time by the defendant as to the former difficulty.

5. *Declarations of deceased; when admissible as res gestæ.*—The declarations of the deceased, made to his wife, when leaving home on the morning of the killing, that he was going to a specified place, are competent evidence on the principle of *res gestæ*.

6. *Declarations of defendant; when not admissible.*—The declarations of the defendant, made on the day before the killing, to the effect that he desired to be on friendly terms with the deceased, and would give the witness $50 if he would effect a reconciliation between them, are not competent evidence for him.

7. *Charges as to malice, provocation of the difficulty, retreat, and self-defense,* ten in number, to which exceptions were reserved by the defendant, held to be in strict harmony with many former rulings of this court, which are cited.

8. *Charges as to reasonable doubt, and probability of innocence.*—A charge asserting that "reasonable doubt, and to a moral certainty, does not mean to an absolute or mathematical certainty, but means·an actual and substantial doubt growing up out of the evidence;" and that a "probability of the defendant's innocence means more than a possibility that he is not or may not be guilty," is free from error.

FROM the Circuit Court of Barbour.

Tried before the Hon. H. D. CLAYTON.

The defendant in this case, Edward R. Martin, was indicted for the murder of Pleasant B. Patterson, by shooting him with a pistol ; pleaded not guilty, was convicted of murder in the second degree, and sentenced to the penitentiary for the term of twenty years. The indictment was found at the November term of the court, 1883, as shown by the recitals of the caption, as follows : "Be it remembered that, on this, being Monday, the 19th day of July, 1883, the Circuit Court of said county was opened according to law ; present and presiding Hon. *H. D. Clayton,*" &c. "The sheriff returned into open court the *venire facias* commanding him to·summon the following named persons, to serve as grand jurors, to-wit," setting out the names of eighteen persons, including C. H. Spencer, T. R. Sylvester, Hugh McLean, and D. McDonald, and then adding : "of whom, fifteen appeared to serve, and C. H. Spencer was appointed foreman, who, with the other qualified citizens (except T. R. Sylvester, Hugh McLean, and D. McDonald, who *was* excused by the court), competent as grand jurors, were duly sworn and impanelled according to law ; and, among other things, the following bill of indictment was returned into open court by said grand jury, to-wit," setting out the indict-

ment.　The trial was had at a special or adjourned term of the court, commenced on the 16th July, and ended on the 21st. The several orders of the court relating to this term are copied in the opinion of the court.　No objection was made to the regularity of any of these proceedings, so far as the record shows.

As to the circumstances attending the homicide, it appeared that the defendant and the deceased, each on horseback, met in the public road, between two and three miles from Mount Andrew in said county, on the 24th August, 1883, and when they had approached within ten or fifteen feet of each other, the defendant, who had drawn his pistol, fired at the deceased and killed him, his body being found in the road by neighbors, to whom the defendant had at once reported the shooting, and surrendered himself.　There had been another difficulty between them, a few days before; and the defendant stated, on surrendering himself, that when they approached each other in the road, the deceased put his hand in his pocket, and made a motion as if to draw a pistol; but it was proved that no pistol was found on the body of the deceased, or in the road at the place where it was found.　L. B. Bush, a witness for the State, was asked, "whether he had heard the defendant, in a conversation with him about the deceased, a few days before the killing, use threats;" and answered, "that defendant said, '*He may kill me, but we have sworn to kill him.　If I get the same chance at him that he had at me, it would be different.*' Defendant's counsel then asked witness, if that language was not immediately preceded by defendant's telling him that Patterson had thrown an axe at him, and shot at him four times in the public road; and witness answered, that it was.　The State then asked said witness to repeat all that defendant said in that conversation, detailing the occurrences of the previous difficulty, to which defendant's question and the answer thereto related.　The defendant objected to this, because it would be proving by hearsay the details of a previous difficulty; and because the answer could not tend to explain whether the language detailed by the witness as a threat was in fact a threat; and because the question was irrelevant and illegal."　The court overruled the objections, and permitted the witness to answer the question, but stated that it was only for the purpose of enabling the jury to determine whether the language used by the defendant, as detailed by the witness, was a threat; or, as contended by his counsel, a mere boast that he was a better man; to which ruling the defendant excepted."　The witness having answered the question, stating all that the defendant had said about his former difficulty with the deceased,

the defendant renewed his objections to the answer, and excepted to the overruling of them.

"The State introduced Rosa Patterson as a witness, who was the wife of the deceased, and who testified, in answer to a question by the solicitor, that the deceased left home, on the day of his death, about one o'clock P. M., and told her he was going to Mount Andrew. The defendant objected to this question and answer, and moved to exclude the answer, because it was hearsay, and because it was not shown that he (defendant) had any knowledge of his purpose in going to Mount Andrew, and because it was irrelevant and illegal;" and he excepted to the overruling of his objections.

"The defendant introduced Daniel McKenzie as a witness, and offered to prove by him that, on the day before the killing, he expressed himself to witness as being desirous of living on friendly terms with the deceased, and said that he would give witness $50 if he would effect a reconciliation." The court excluded this evidence, on objection by the State, and the defendant excepted.

The defendant objected to several portions of the general charge of the court, which it is unnecessary to state, and also to each one of the following charges, which were given on the request in writing of the solicitor:

"4. To make out a case of justifiable self-defense, the evidence must show that the difficulty was not provoked or encouraged by the defendant; that he was, or appeared to be, so menaced at the time as to create reasonable apprehension of danger to his life, or of grievous bodily harm, and that there was no other reasonable hope of escape from such present impending peril.

"6. To make the plea of self-defense available, the defendant must be without fault. If he was himself the first aggressor, he can not invoke the doctrine of self-defense, even if the deceased was approaching him in a hostile manner; and whether the necessity to take the life of the deceased was real or only apparent, if brought about by the design, contrivance or fault of the defendant, he can not be excused on the plea of self-defense.

"7. If a party, dangerously armed, provokes a hostile demonstration with an undue advantage, he is guilty of murder, if he slays his adversary pursuant to a previously formed design to use his weapon in an emergency. Previous preparation for a rencounter evinces deliberation and premeditation, and, unexplained, is evidence of express malice.

"8. If the defendant had a good reason to apprehend an attack from the deceased, he had the right to arm himself for self-defense, but not for aggression. His responsibility for the

subsequent use of his weapon is not diminished, because of the right he had to obtain and carry it. If, after having obtained it, he travelled the public road, expecting to meet the deceased, and provoked the fatal rencounter, the degree of his guilt is the same that it would have been if no reason for apprehending an attack had been furnished by the previous conduct of the deceased. If, notwithstanding the existence of apprehension, the jury are satisfied, beyond a reasonable doubt, that the killing was malicious—that the weapon was obtained and carried by the defendant, not for the purpose of defense alone, but with a view to a rencounter, in which he intended to take the life of the deceased, and which he intended to provoke, or did not intend to avoid—the degree of the offense is not mitigated.

" 9. If the circumstances are such as to create the impression that the deceased had commenced to draw a pistol, before the defendant drew, or attempted to draw his ; or if the circumstances generate a reasonable doubt whether such was not the case ; then this should be considered in determining the grade of the homicide, but could not reduce it to self-defense, unless the deceased made the first hostile, dangerous demonstration, and the defendant had no other reasonable mode of escape. If the defendant first commenced to draw his pistol, that would have authorized the deceased to draw his in self-defense, if he had one ; and any peril thereby brought on the defendant would have been of his own producing, and would deny to him the benefit of the plea of self-defense. Human life is not taken with impunity, and the defendant can not be excused on the plea of self-defense, if he provoked or encouraged an act producing a necessity, or seeming necessity, or failed to retire from it when he could have done so without endangering his life, or exposing himself to grievous bodily harm.

" 10. If the deceased, when within one hundred and fifty or two hundred yards of the defendant, approaching each other on a public road, made a hostile demonstration with his hand, or otherwise, which impressed the defendant with the belief that the deceased intended, when they met, to attack him with a weapon, or otherwise; yet, if the defendant could have reasonably avoided the threatened danger, by leaving the public road, and taking a by-path, or by going into the woods, it was his duty to have done so, and if he did not, he can not be excused on the plea of self-defense, if he had previously armed himself with a pistol, to be used against the deceased in case of a difficulty, and he anticipated there would be a difficulty when they met.

" 11. In case of homicide, the law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling the presumption, unless the evidence which proves

[Martin v. The State.]

the killing shows also that it was perpetrated without malice; and whenever malice is shown, and is unrebutted by the circumstances of the killing, or by other facts in evidence, there can be no conviction for any less degree of homicide than murder.

" 14. If the defendant, in this county, before the finding of the indictment, purposely killed the deceased by shooting him with a pistol, after reflection, with a wickedness or depravity of heart towards said deceased, and the killing was determined on before hand, even a moment before the fatal shot was fired, the defendant is guilty of murder in the first degree.

" 15. If the defendant, in this county, and before the finding of this indictment, purposely killed Pleasant B. Patterson by shooting him with a pistol, with a wickedness or depravity of heart towards said deceased, and the killing was determined on beforehand, and after reflection (for however short a time before the fatal shot was fired is immaterial), the defendant is guilty of murder in the first degree.

" 16. If the defendant, in this county, and before the finding of this indictment, killed Pleasant B. Patterson by shooting him with a pistol, with malice aforethought, he is guilty of murder; and if said killing was willful, deliberate, malicious, and premeditated, and the deliberation and premeditation existed for only a moment before the fatal shot was fired, the defendant is guilty of murder in the first degree."

" The court gave, also, thirty-seven charges in writing asked by the defendant," twenty-two of which are set out in the bill of exceptions, "and then gave, at the request of the solicitor, the following charges in rebuttal: "(3.) Reasonable doubt, and to a moral certainty, does not mean to an absolute or mathematical certainty. It means an actual and substantial doubt growing up out of the evidence—not that it is possible the defendant is not guilty, or that it may be he is not guilty. (5.) In the defendant's charges, when they say 'If there is a probability of the defendant's innocence,' probability means more than a possibility he is not guilty, and more than that it may be he is not guilty." To each of these charges the defendant excepted.

J. M. WHITE, and H. D. CLAYTON, Jr., for appellant.

T. N. McCLELLAN, Attorney-General, for the State.

STONE, C. J.—1. The statute prescribes, that at least fifteen persons must be sworn, to constitute a grand jury. Code of 1876, § 4753. It is contended for the prisoner, that under a proper interpretation of the caption, or recorded organi-

zation of the court at which the indictment was found, only twelve persons constituted the grand jury. We do not so interpret the record. According to our construction, of the eighteen persons named in the *venire*, three named persons—T. R. Sylvester, Hugh McLean, and D. McDonald—were excused by the court, and the remaining fifteen were sworn and organized into a grand jury, with C. H. Spencer as foreman. There is nothing in this objection.

2. The defendant was tried and convicted at an irregular, or extra session of the court. In some of the proceedings, the term is called an adjourned term, and in others a special term. It seems to have been appointed and called in both forms. While the regular Spring term was in session—May 30th, 1884 —the court caused the following order to be entered on the minutes: "The defendant, E. R. Martin, *alias* Edward R. Martin, being present in open court, and attended by counsel, it is ordered by the court, that Wednesday, the 16th day of July next, be set for the trial of this case, and that fifty competent persons be drawn and summoned for the trial of this case; and the defendant being in actual confinement, it is further ordered, that a list of the persons so drawn and summoned, and a copy of the indictment, be served on the defendant in person, so soon as practicable." On the next day, the following order was made: " And now, on this, the 31st day of May, A. D. 1884, the presiding judge having failed to dispose of all the business, it is ordered by the court, that the court do now adjourn until Wednesday, the 16th day of July next, when it will re-open to dispose of unfinished business; and there being a capital felony for trial at said adjourned term, it is further ordered, that the names of fifty competent persons be drawn from the box by the proper officers, as required by law, to serve as petit jurors at said adjourned term."

Up to this point, there can be no question that the July term was to be in all respects an adjourned term, under the act " to require circuit judges more promptly to dispose of all business in the Circuit Courts," approved February 29, 1876.—Sess. Acts, 210; Code of 1876, § 654.

When the court convened in July, the following entry was made: " On this, the 16th day of July, A. D. 1884, the Circuit Court of said county met, and was opened in form in adjourned term, in pursuance of the following order, to-wit: " Circuit Court, Spring term, 1884. It appearing that Ed. R. Martin, *alias* Edward R. Martin, is now confined in jail under an indictment for murder, and the time fixed by law for the regular term of the court is insufficient for the trial of said case; it is therefore ordered, that a special term of the Circuit Court for Barbour county will be held, beginning on Wednesday, the

[Martin v. The State.]

16th July next, for the trial of the said Edward R. Martin under said indictment ; and it is further ordered, that fifty competent jurors be drawn and summoned, as provided by law, and that thirty days notice of said special term of said court be given by advertisement of this order in the *Clayton Courier*, a newspaper published in said county. Signed and dated this 31st day of May, 1884. 'H. D. CLAYTON, Judge 3d judicial circuit.' Which said order was published for thirty days, as notice of said special term, in the *Clayton Courier*, a newspaper published in said county : Present and presiding, Hon. H. D. CLAYTON," &c.

This is a full compliance with the statute " to provide for holding special terms of the Circuit Court," approved February 3d, 1875.—Sess. Acts, 201 ; Code of 1876, § 652. We have a case, then, of a court which was lawfully appointed and called, both as an adjourned term and as a special term.

The order setting a day for the trial of the accused was made during the regular term, on May 30 ; while the order made for the adjourned term was not entered of record until May 31. It is contended that the order setting the day for the trial was invalid, because, when it was made, July 16 was not a day of a lawful term of the court, as matters then stood ; in other words, that the day set was then outside of any lawful term of the court. This objection is more specious than real. It is said that, during the term of a court, all the proceedings are in the breast of the judge. The meaning of this is, that so long as the term of the court lasts, all judgments or orders are subject to be vacated, recalled, or modified, at the pleasure or will of the presiding judge. The inference is irresistible, that when the order was made, fixing the day for defendant's trial, the court had determined to hold an adjourned or special term, and had determined the day on which it would be held. The entry of such order on the records is usually and naturally the last order made at the regular term. It is then the court adjourns to a future day, called an adjourned term. It is difficult to conceive of any injury this could do the defendant. He was present in court when the order was made, and was as fully notified thereby, as if the order fixing the adjourned term had been previously entered of record. The court did not err in fixing, at the regular term, the day for the trial of the defendant at the adjourned term. The statute provides, that the "judge may prescribe the order in which such unfinished business shall be disposed of."

3. It is objected, however, that the *venire* for the trial of the accused should not have been "drawn and summoned," but should have been constituted as *venires* are in the trial of capital cases at regular terms.—Code of 1876, § 4874.

It must be borne in mind, that the term of the court, at which the defendant was tried, was legally ordered and called, alike as an adjourned and as a special term. The jury was drawn and summoned in exact pursuance of statutory requirements for juries at special terms of the court. A capital felony was to be tried, and the court ordered fifty names to be drawn and summoned.—Code of 1876, § 4739. These constitute the *venire*, from which the jury is to be selected and organized, unless the panel is exhausted before the jury is complete; in which case, talesmen must be summoned as in other capital cases.—*Levy v. The State*, 48 Ala. 171. We are satisfied this is the true spirit and interpretation of the section under discussion; for section 4874 of the Code contemplates that there will be in attendance regular juries for the week or term, who constitute a part of the *venire* the sheriff is commanded to summon. This is not consistent with the directions for summoning juries for special terms of the court.—Code, § 4739. There is nothing in this objection. We may add, that there was no objection in the court below to the manner of summoning the *venire*; but we do not make this the ground of our decision.

For myself, I incline to the opinion, that section 4739 of the Code of 1876 should be held to apply to all extra terms, whether special or adjourned. The substance of that section is found in the Code of 1852, § 3446; Rev. Code, § 4068. At that time, and until February 29, 1876, adjourned terms were not known. It would maintain the harmony of the system to give it this interpretation, and I confess myself unable to find in the two statutes—that of February 3, 1875, and that of February 29, 1876—a substantial reason for different interpretation. Each statute, in a sense, provides for an extra term of the court, and each authorizes a special, as distinguished from a general term. In each, as provided to be organized, there will be difficulty in finding "regular juries for the week or term," to constitute a part of the *venire* the sheriff is required to summon under section 4874 of the Code. This question, however, is not intended to be decided.

4. The questions to Bush, and his answers to them, do not raise the question of proving the details of a previous difficulty. That is not permissible, lest, in passing on the merits of one charge, the attention of the jury may be diverted, or confused, by laying before them the details and merits of another.—*McAnally v. The State*, 74 Ala. 9. The true question was one of the entirety of a conversation. Part of the conversation had been proved against the defendant, as a threat. Thereupon, defendant called out other parts of the same conversation, deemed favorable to himself. The State

[Martin v. The State.]

then called for the whole conversation relating to the same subject-matter. This either party was entitled to, for the better understanding of that part already in evidence.—*McLean v. The State*, 16 Ala. 672 ; 1 Greenl. Ev. § 201.

5. There was no error in permitting Mrs. Patterson to testify, that the deceased, when he left home, told her he was going to Mount Andrew. It was legal evidence, as a *res gestæ* declaration.—1 Greenl. Ev. § 108.

6. The testimony sought to be elicited from the witness, McKenzie, was not legal evidence. It was *res gestæ* to nothing, and its admission would have been to allow defendant to make testimony for himself.—*McLean v. The State*, 16 Ala. 672 ; *The State v. Umfried*, 76 Mo. 404 ; *Rea v. The State*, 8 B. J. Lea, 356 ; *Billingslea v. The State*, 68 Ala. 486 ; *Stewart v. The State*, 63 Ala. 199.

The first page of the charges is stated so confusedly that we can not undertake to decide the questions attempted to be raised.

7. The court gave, at the instance of the State, charges Nos. 4, 6, 7, 8, 9, 10, 11, 14, 15 and 16; and to the giving of each defendant excepted. They relate to the doctrine of malice, provocation of the difficulty, retreat, and self-defense; and are in strict harmony with many rulings of this court.—*Mitchell v. The State*, 60 Ala. 26 ; *Ex parte Brown*, 65 Ala. 446 ; *Ingram v. The State*, 67 Ala. 67 ; *Cross v. The State*, 63 Ala. 40 ; *Storey v. The State*, 71 Ala. 329 ; *DeArman v. The State*, *Ib.* 351.

8. Explanatory charges 3 and 5 are free from error.—*Coleman v. The State*, 59 Ala. 52 ; *Bain v. The State*, 74 Ala. 38.

Affirmed.